UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

NEIL McNAUGHTON,

                                    Plaintiff,

                    v.

BILL de BLASIO, *et al.*,

                                    Defendants.

-----------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 4, 2015
```

14 Civ. 221 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

    In his Amended Complaint, Plaintiff Neil McNaughton presents a riveting tale of intra-family machinations, egregious sexual misconduct (actual or alleged), coopting of two different law enforcement bodies, near-daily attempts at entrapment, and countless invasions of Plaintiff's home and computer. To the moving defendants, the City of New York (the "City") and several of its officers (collectively, the "Municipal Defendants"), as well as Plaintiff's sister Laura McNaughton (together with the Municipal Defendants, the "Moving Defendants"), these allegations are just that — a tale that cannot withstand scrutiny under Fed. R. Civ. P. 12(b)(6). For the reasons set forth in the remainder of this Opinion, Defendants' motions are granted.

# BACKGROUND[1]

## A.   Factual Background

According to Plaintiff, the problems culminating in the instant litigation began at least as early as the spring of 2007, when Plaintiff learned that his sister Laura was accusing him — falsely, he claims — of being a pedophile. (Am. Compl. ¶ 11).[2]  Plaintiff avers that these statements adversely affected his relationships with members of his family (*id.*); in his opposition papers, for example, he suggests that the statements caused a female cousin to prohibit Plaintiff from spending time with her young children (Pl. Opp. 5-6).

Were that the totality of Plaintiff's claims, the plausibility inquiry that inheres in Rule 12(b)(6) would not be implicated.  In the remainder of the Amended Complaint, however, Plaintiff attempts to posit a Grand Unified Theory — involving his sister and two wholly unrelated police departments — to link together a multitude of seemingly unrelated "anomalous occurrences." (Am. Compl. ¶ 35).  It is here that Plaintiff's allegations lose their tethers to logic and common sense.  First, Plaintiff claims that his sister advised the Montclair (NJ) Police Department (the "MPD"), in or about 2009, that Plaintiff

---

[1]   The facts alleged herein are drawn from Plaintiff's Amended Verified Complaint (the "Amended Complaint" or "Am. Compl." (Dkt. #20)).  For convenience, the Municipal Defendants' brief in support of their motion to dismiss (Dkt. #34) will be referred to as "Def. Br."; Plaintiff's opposition (Dkt. #35) as "Pl. Opp."; and the Municipal Defendants' reply brief (Dkt. #37) as "Def. Reply."  Defendant Laura McNaughton's brief in support of her motion to dismiss (Dkt. #6) will be referred to as "LM Br."; Plaintiff's opposition (Dkt. #12) as "Pl. LM Opp."; and her reply brief (Dkt. #16) as "LM Reply."

[2]   While the Court is required to accept Plaintiff's well-pleaded allegations as true, it notes that in other documents submitted to the Court, Plaintiff has acknowledged a prior sexual relationship with his younger sister.  (*See, e.g.*, Dkt. #24 at 2 (recounting two episodes as a twelve-year-old of "sexual exploration" with Defendant Laura McNaughton)).

was a pedophile.  (*Id.* at ¶ 12).  According to Plaintiff, she did so because Plaintiff visited Montclair weekly to check in on his ailing mother.  (*Id.*).  These allegations, irrespective of their truth, are plausible; what is next alleged is much less so.

As a result of Laura McNaughton's slanderous statements, Plaintiff alleges, the MPD engaged in a "baiting" campaign, in the course of which the police repeatedly "paraded [underage girls] before him while he [wa]s under surveillance in an attempt to elicit behavior that could subject him to arrest." (Am. Compl. ¶ 12).[3]  However, after persisting with this baiting activity for some *18 months* without success, the MPD stopped the campaign.  (*Id.*).  At or about this time, which Plaintiff believes to be the summer of 2011, his sister again falsely accused him of being a pedophile; this time, however, she reported these allegations to the New York City Police Department (the "NYPD") or the New York Department of Parks.  (*Id.* at ¶ 14).

Here, too, Plaintiff veers sharply from the plausible in his allegations. According to Plaintiff, the information provided by his sister to the NYPD resulted in an entirely new campaign of baiting activity, "this time in plaintiff's own neighborhood, and nearly every time plaintiff left his apartment there was some under[age] girl smiling at him, usually with a concerned parent nearby." (Am. Compl. ¶ 14).   And, in contrast to the MPD campaign, the NYPD baiting

---

[3]     Plaintiff also claims that a detective from the MPD visited his mother, causing her distress.  However, Plaintiff does not allege the reason for that visit, but rather assumes, based on the contemporaneity of the baiting campaign, that the visit was prompted by his sister's allegations.  (Am. Compl. ¶ 13).

campaign has continued for more than three years: Plaintiff recites in his opposition to the instant motion that the NYPD baiting campaign "has involved hundreds of incidents and lasted from the summer of 2011 until the present day." (Pl. Opp. 19).  Plaintiff further explained in a separate complaint that "[f]or some reason the police apparently think I have a preference for Asian children, and they have informed the Asian community.  Almost every time I leave my apartment now, there is some underage Asian girl walking nearby me with a concerned middle aged parent or grandparent lurking nearby."  (Dkt. #33-2 at 4).

In addition, Plaintiff avers that the NYPD implemented a "stalking" campaign, by which "there would be a police car or patrolman around nearly every time plaintiff left his apartment."  (Am. Compl. ¶ 15; *see also* Pl. Opp. 19 (noting that the "police stalking behavior … has involved dozens if not hundreds of police officers and lasted from the fall of 2012 until the present day")).  Plaintiff does not allege that any of these officers approached him, spoke to him, or visited his apartment building[4]; nonetheless, he maintains that instances in which he observed "numerous patrol cars" (Am. Compl. ¶ 19) on his return home from New Jersey, or while visiting the New York Public Library (*id.* at ¶¶ 26-27), were evidence of a concerted investigation by the NYPD into his conduct.

---

[4]     Plaintiff's actual interactions with the NYPD are discussed *infra*, and appear limited to an unsuccessful effort to solicit assistance from the NYPD's Computer Crimes Squad and an encounter at a local Dunkin Donuts.

In or about October 2012, Plaintiff sought the assistance of computer forensic specialists, so that he could demonstrate to the NYPD that his computer contained no evidence "that he had [an] interest in children." (Am. Compl. ¶ 16). At that time, however, Plaintiff noticed that certain emails and documents were missing from his computer. He concluded that "they were deleted by the NYPD." (*Id.* at ¶ 17).

In January 2013, Plaintiff filed a complaint with the Civilian Complaint Review Board (the "CCRB") concerning his interactions with the NYPD; he avers that he received no response. (Am. Compl. ¶ 19).[5] Efforts to seek assistance from the NYPD's Computer Crimes Squad were met with derision. (*Id.* at ¶ 20). Instead, Plaintiff was subject to additional surveillance of his home and his computer; documents were modified in or deleted from his computer, presumably by or at the behest of the NYPD. (*See, e.g.*, *id.* at ¶¶ 21-25). Plaintiff summarily concluded that either the NYPD or others acting at its direction must have "illegally entered plaintiff's apartment and tampered with evidence in plaintiff's possession." (*Id.* at ¶ 29).

According to Plaintiff, the NYPD has spread the defamatory statements to others, which has had the effect (if not the design) of complicating Plaintiff's ability to bring the instant case. For example, Plaintiff notes that a

---

[5]     In addition to the computer issues, Plaintiff also recounted for the CCRB an incident in December 2012, when Plaintiff and several NYPD officers were in a Manhattan Dunkin Donuts location, during which Plaintiff claimed an NYPD officer cut his pants with a knife in the crotch area. (Am. Compl. ¶ 18). The CCRB complaint, which has been included as an exhibit to the briefing on the instant motion (Dkt #33-2), may be considered by the Court because it has been incorporated by reference in the Amended Complaint (*see* Am. Compl. ¶ 19).  .

communication from the process server he used in this case referred to him as
"Mr. Naughtiness"; that error, along with certain missteps in the service
process, are alleged by Plaintiff to have been "caused by the republication of
the slander that plaintiff was a pedophile by the NYPD to [the process server]
and were done in concert with the NYPD." (Am. Compl. ¶ 34). Plaintiff
similarly cites improper interference by the NYPD to explain why Plaintiff had
difficulties retaining a forensic expert to analyze fingerprints from his
apartment. (*Id.* at ¶ 35).

At the close of the factual allegations in the Amended Complaint, Plaintiff
issues a blanket allegation that his sister, Laura McNaughton, "aided the police
in these violations of plaintiff's privacy and civil rights and personally engaged
in an unauthorized search of plaintiff's documents and belongings." (Am.
Compl. ¶ 36).

## B.  Procedural Background

Plaintiff filed his initial complaint (the "Complaint") on January 13, 2014,
naming as defendants Mayor Bill de Blasio, then-NYPD Commissioner
Raymond Kelly, the City, the NYPD, "Detective Jackson" (the individual at the
NYPD Computer Crimes Squad with whom Plaintiff had spoken), various Jane
and John Doe NYPD officers and detectives, and Laura McNaughton. (Dkt. #1).
On May 20, 2014, Defendant Laura McNaughton filed a motion to dismiss
based on lack of personal jurisdiction and failure to state a claim. (Dkt. #6).
Plaintiff responded by memorandum dated May 22, 2014, and filed the next

day (Dkt. #12); and Laura McNaughton replied by memorandum dated May 30, 2014, and filed on June 2, 2014 (Dkt. #16).

By Order dated May 27, 2014, the Court convened a conference on June 26, 2014 (the "June 26 Conference"), to discuss the pending motion to dismiss and other issues related to the pretrial conduct of the litigation.  (Dkt. #11). Thereafter, on May 30, 2014, counsel for the Municipal Defendants sought additional time to file a response to the Complaint, indicating their intention to file a motion to dismiss for failure to state a claim.  (Dkt. #14).  On June 4, 2014, Plaintiff filed the Amended Complaint, which replaced Defendant Kelly with his successor at the NYPD, Commissioner William Bratton, and significantly expanded upon the allegations in the Complaint.  (Dkt. #20).

At the June 26 Conference, the Court set a briefing schedule for the Municipal Defendants' motion to dismiss.  (*See* Transcript of Conference of June 26, 2014 ("June 26 Tr.") 15-16 (Dkt. #29)).  Additionally, the Court informed Laura McNaughton, who was proceeding *pro se*, that — barring any supplemental filings received by August 1, 2014 — her previous submissions in support of dismissal of the Complaint (*see* Dkt. #6, 16) would be deemed her moving papers in connection with her motion to dismiss the Amended Complaint (*see* June 26 Tr. 15).[6]

After the June 26 Conference, Plaintiff indicated that he was consenting to the dismissal of the action as to Defendants Kelly and the NYPD, and the

---

[6]     No supplemental filings in support of Laura McNaughton's motion to dismiss the Amended Complaint were filed after the June 26 Conference.

Court ordered the dismissal accordingly.  (Dkt. #27, 28).[7]  On August 1, 2014, the Municipal Defendants moved to dismiss the Amended Complaint (Dkt. #31-34); Plaintiff responded on September 2, 2014 (Dkt. #35); and the Municipal Defendants replied on September 16, 2014 (Dkt. #37).

## DISCUSSION

### A.   Applicable Law

#### 1.   Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

Defendants have moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  When considering such a motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).

A plaintiff will survive a motion to dismiss if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*,

---

[7]    Plaintiff refused to consent to the dismissal of the Amended Complaint as to Mayor de Blasio.  (Dkt. #27).  There is some confusion, however, concerning the status of putative Defendant Bratton.  Plaintiff initially consented to dismissal of the Amended Complaint as to him.  (Dkt. #26).  As a result, the brief filed by the City's Law Department recites that organization's representation of Defendants de Blasio and the City alone, while noting that certain of its arguments would apply equally to other defendants.  (Def. Br. 1 n.1).  In his opposition, Plaintiff noted the Court's failure to issue a dismissal order specifically naming Bratton, and announced that he was withdrawing his prior consent.  (Pl. Opp. 1-2 n.1).  Accordingly, the Court will consider Bratton to be a defendant in this case, but will extend the Law Department's arguments to apply to him to the extent factually and/or legally appropriate.

The docket reflects, and the Law Department asserts without contradiction by Plaintiff (Def. Br. 1 n.1), that Defendant Detective Jackson was not served with the Amended Complaint in this action.  Accordingly, the Court dismisses that complaint as to him pursuant to Fed. R. Civ. P. 4(m).

550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).  A court is not, however, bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks and citation omitted).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  *DiFolco* v. *MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough."  *Id.* (emphasis in original). "'If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true.'"  *TufAmerica, Inc.* v. *Diamond*,

968 F. Supp. 2d 588, 592 (S.D.N.Y. 2013) (quoting *Poindexter* v. *EMI Record Grp. Inc.*, No. 11 Civ. 559 (LTS), 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012)).

Plaintiff is correct that courts generally construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest. (Pl. Opp. 7).  *See Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (citing *Graham* v. *Henderson,* 89 F.3d 75, 79 (2d Cir. 1996)).  Here, however, Plaintiff is an attorney, and is thus not entitled to liberal construction of his pleadings. *See Tracy* v. *Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010); *Holtz* v. *Rockefeller & Co.*, 258 F.3d 62, 82 n.4 (2d Cir. 2001) ("*pro se* attorneys typically cannot claim [that] special consideration" (internal quotation marks omitted)); *see generally Erickson* v. *Pardus*, 551 U.S. 89, 94 (2007) (concluding that pleadings drafted by lawyers are held to a more stringent standard than *pro se* pleadings).

### 2.   Section 1983 Claims Generally

Plaintiff brings a claim under Section 1983, which establishes liability for deprivation, under the color of state law, "of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."  *Wyatt* v. *Cole*, 504 U.S. 158, 161 (1992) (citation omitted).  As such, a "§ 1983 claim has two essential elements: [i] the defendant acted under color of state law; and [ii] as a result of the defendant's

actions, the plaintiff suffered a denial of h[is] federal statutory rights, or h[is] constitutional rights or privileges." *Annis* v. *County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998); *see also City of Oklahoma City* v. *Tuttle*, 471 U.S. 808, 816 (1985) ("By its terms, of course, [42 U.S.C. § 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere.").

As a prerequisite to an award of damages under Section 1983, a plaintiff must show the personal involvement of the defendants in the alleged constitutional deprivations. *See Farrell* v. *Burke*, 449 F.3d 470, 484 (2d Cir. 2006). To show personal involvement, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* (citing *Twombly*, 550 U.S. at 555).

A court may consider supervisory personnel to be "personally involved" if a plaintiff plausibly alleges facts showing that those defendants: (i) participated directly in the alleged constitutional violation; (ii) failed to remedy the wrong after being informed of it; (iii) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (iv) were grossly negligent in supervising subordinates who committed the wrongful acts; or (v) exhibited deliberate indifference to the rights of citizens by failing to act on information indicating there were ongoing

11

unconstitutional acts.  *Grullon* v. *City of New Haven,* 720 F.3d 133, 138 (2d Cir. 2013) (citing *Colon* v. *Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)).[8]

Municipal entities may be sued directly for constitutional violations pursuant to 42 U.S.C. § 1983, *Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), but cannot be held liable for the acts of their employees under the doctrine of *respondeat superior*, *Pembaur* v. *City of Cincinnati*, 475 U.S. 469, 478 (1986).  In other words, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal* v. *City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (citing *Monell*, 436 U.S. at 694) (emphasis in *Segal*).

A plaintiff may establish municipal liability under *Monell* in several ways, including by presenting evidence of

> [i] an express policy or custom, [ii] an authorization of a policymaker of the unconstitutional practice, [iii] failure of the municipality to train its employees, which exhibits a "deliberate indifference" to the rights of its citizens, or [iv] a practice of the municipal employees that is "so permanent and well settled as to imply the constructive acquiescence of senior policymaking officials."

---

[8]     Courts have disagreed as to whether the five *Colon* factors continue to apply after *Iqbal. See Landron* v. *City of New York*, No. 14 Civ. 1046 (NRB), 2014 WL 6433313, at *4 n.1 (S.D.N.Y. Nov. 7, 2014) (collecting cases); *Vogelfang* v. *Capra*, 889 F. Supp. 2d 489, 502 (S.D.N.Y. 2012) (same); *see also Raspardo* v. *Carlone*, 770 F.3d 97, 116-17 (2d Cir. 2014) (declining to decide the degree to which *Colon* survives *Iqbal*).  Any such uncertainty, however, does not alter settled law that "[t]he mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983."  *Styles* v. *Goord*, 431 F. App'x 31, 33 (2d Cir. 2011) (summary order) (collecting cases).

*Biswas* v. *City of New York*, 973 F. Supp. 2d 504, 536 (S.D.N.Y. 2013) (quoting *Pangburn* v. *Culbertson*, 200 F.3d 65, 71-72 (2d Cir. 1999)).

**B.     Application**

**1.     The Complaint Is Dismissed as to Defendants De Blasio and Bratton**

The viability of the Amended Complaint hinges principally on the plausibility of its allegations.  That said, even crediting every allegation in the Amended Complaint, Plaintiff has failed to state a claim under Section 1983 with respect to Mayor de Blasio and Commissioner Bratton.  There are no allegations in the Amended Complaint regarding any conduct by or on behalf of either of these defendants, nor, indeed, any direct knowledge of or involvement in the events of which Plaintiff now complains.  Instead, Plaintiff avers that these two defendants are "liable for the plaintiff's constitutional deprivations since these deprivations upon information and belief resulted from established customs, policies and procedures of the City and the New York Police Department."  (Am. Compl. ¶ 41; *see also id.* (noting that the numerosity of NYPD officers involved "mandates a finding of attribution to the NYPD and the City," and that the alleged deprivations were the result of failure to train and/or supervise the officers)).  Such conclusory allegations are, of course, insufficient to warrant the imposition of supervisory liability.  *See Lindsey* v. *Butler*, No. 11 Civ. 9102 (ER), — F. Supp. 2d —, 2014 WL 4290367, at *9 (S.D.N.Y. Aug. 29, 2014) ("In order to hold supervisors liable for creating a custom or policy fostering a constitutional violation, courts in this Circuit have required that plaintiffs plead more than conclusory allegations of the existence

of the custom or policy." (collecting cases)); *Bridgewater* v. *Taylor*, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) (dismissing complaint as to supervisors, where liability predicated on "conclusory statements" and "bare assertions"); *cf.* *Gorzynski* v. *JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (noting that non-moving parties "must provide more than conclusory allegations to resist a motion for summary judgment"). Accordingly, the Section 1983 claim against Defendants de Blasio and Bratton is dismissed.

### 2. The Complaint Is Dismissed as to the City of New York

#### a. The Principal Allegations Underlying Plaintiff's Section 1983 Claim Against the City Are Not Plausible

The Court next addresses the Section 1983 claim against the City, which claim is predicated on the actions of numerous unidentified NYPD officers and detectives. "To hold a municipality liable in such an action, a plaintiff is required to plead and prove three elements: [i] an official policy or custom that [ii] causes the plaintiff to be subjected to [iii] a denial of a constitutional right." *Zahra* v. *Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (internal quotation marks omitted) (collecting cases); *see also City of Canton, Ohio* v. *Harris*, 489 U.S. 378, 385 (1989) ("Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."). As discussed herein, Plaintiff falls at the first and second hurdles, inasmuch as he has alleged neither a policy or practice nor a causal connection between the identified policy or practice and the claimed violations

14

of his constitutional rights.  However, in an abundance of caution, the Court

will address the third issue as well.

The Second Circuit has made clear that

> [t]o survive dismissal, [a plaintiff] "must provide the grounds upon which [his] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting [*Twombly*, 550 U.S. at 555]).  As the Supreme Court explained in *Ashcroft* v. *Iqbal*, a complaint that merely "tenders naked assertions devoid of further factual enhancement" fails to meet this standard.  556 U.S. 662, [678] (2009) (quotation marks and alterations omitted). Moreover, even if the complaint contains sufficiently "well-pleaded" allegations, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 1950.  A court may dismiss a claim as "factually frivolous" if the sufficiently well-pleaded facts are "clearly baseless" — that is, if they are "fanciful," "fantastic," or "delusional."  *Denton* v. *Hernandez*, 504 U.S. 25, 32-33 [(1992)] (quoting *Neitzke* v. *Williams*, 490 U.S. 319, 325 [(1989)] (quotation marks omitted).

*Gallop* v. *Cheney*, 642 F.3d 364, 368 (2d Cir. 2011); *see also Iqbal*, 556 U.S. at

679 ("Determining whether a complaint states a plausible claim for relief will,

as the Court of Appeals observed, be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.  But

where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct, the complaint has alleged — but it has not

show[n] — that the pleader is entitled to relief." (internal quotation marks and

citations omitted) (alteration in *Iqbal*)).

Put simply, the allegations in the Amended Complaint "do not rise to the

requisite level of facial plausibility."  *E.E.O.C.* v. *Port Authority of N.Y. and N.J.*,

768 F.3d 247, 253 (2d Cir. 2014) (internal quotation marks omitted). In 46

paragraphs, Plaintiff employs some variant of "upon information and belief" 27

times. To be sure, *Twombly* "does not prevent a plaintiff from pleading facts

alleged upon information and belief where the facts are peculiarly within the

possession and control of the defendant, or where the belief is based on factual

information that makes the inference of culpability plausible." *Arista Records,*

*LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks and

citations omitted). However, such allegations must be "accompanied by a

statement of the facts upon which the belief is founded." *Prince* v. *Madison*

*Square Garden*, 427 F. Supp. 2d 372, 385 (S.D.N.Y. 2006) (internal quotation

marks and citations omitted). Here, Plaintiff's allegations are marked by

extraordinary (and unjustified) leaps of logic. As but a few examples:

- The Court accepts, for purposes of this motion, Plaintiff's allegation that his sister reported to at least two police departments that he was a pedophile. (Am. Compl. ¶¶ 12, 14). However, it cannot accept Plaintiff's allegations that these reports engendered "baiting" campaigns that were months, if not years, in duration by the police, in the course of which scores of underaged girls (many accompanied by their parents) were paraded in front of Plaintiff for the express purpose of enticing him to act out on his ostensibly pedophilic tendencies. (*See id.* at ¶¶ 12, 14-16). Further underscoring the delusional nature of these allegations are (i) Plaintiff's references to these underage girls in his opposition brief as "citizen vigilantes" (Pl. Opp. 15, 16, 17, 19); and (ii) the salaciousness of his accounts, such as his recollection in his CCRB complaint that "[f]rom that point on, there were paraded before me ... dozens and dozens of underage cuties, a few dressed like hookers" (Dkt. #33-2 at 3; *see also id.* at 4).

- Similarly, the Court takes as true Plaintiff's allegations that he observed law enforcement vehicles near his apartment building and in other public areas, such as the New York

Public Library. (Am. Compl. ¶¶ 15, 19, 26). However, particularly in light of Plaintiff's failure to allege that any of these officers acknowledged, approached, or spoke to Plaintiff, the Court cannot accept Plaintiff's allegation that this law enforcement presence in public areas, however extensive, amounted to a "stalking" campaign designed by the NYPD to intimidate him.

- Plaintiff avers on several occasions that electronic versions of significant documents were found to be missing from his computer files. (Am. Compl. ¶¶ 17, 21-22, 24). However, Plaintiff offers *no* facts that could support a reasonable inference these computer issues were caused by the NYPD.

- Finally, the Court finds entirely too far-fetched Plaintiff's allegations that the alleged conspiracy to violate his constitutional rights expanded from his sister and the NYPD to include third parties, including (i) a security guard at the New York Public Library who stopped speaking with Plaintiff and glared at him; (ii) a second security guard who observed, correctly, that Plaintiff had been to that branch previously; (iii) the process server Plaintiff employed in this litigation, which experienced certain non-fatal difficulties with serving the Complaint;[9] and (iv) a fingerprint expert who declined to provide assistance to Plaintiff, reasoning that the fingerprints Plaintiff sought to analyze were too old. (Am. Compl. ¶¶ 27, 33-35).

The Amended Complaint also suffers from a dearth of allegations of actual conduct by the NYPD. In this regard, the Court disregards certain facially deficient allegations; these include the claims of a "baiting campaign," which are at once fanciful and untethered to allegations of police activity, and

---

[9] Plaintiff's allegations concerning his process server are particularly chimerical. Plaintiff reasons that certain problems with effecting and documenting service, "upon information and belief[,] were caused by the republication of the slander that plaintiff was a pedophile by the NYPD to [the process server] and were done in concert with the NYPD." (Am. Compl. ¶ 34). However, his factual support for this allegation is his receipt of an email from the process server addressed to "Mr. Naughtiness." (*Id.*). This salutation is plainly insufficient to constitute evidence of a constitutional violation or a conspiracy with the NYPD. The Court notes, as a point of information only, that when it typed Plaintiff's surname into its smartphone, the phone's autocorrect feature replaced "Naughton" with "Naughtiness."

Plaintiff's conclusory statements that various "anomalous occurrences" must, for want of an alternate unifying explanation, have been the product of NYPD involvement.  Plaintiff's allegations of actual contact with the NYPD are quite limited; these contacts include (i) his January 2013 telephone call with Defendant Jackson, who rebuffed Plaintiff's requests for a meeting and announced that Plaintiff lacked evidence of computer hacking; and (ii) his December 2012 encounter with NYPD officers in a Dunkin Donuts, during which Plaintiff's pants were torn.  These allegations the Court can accept for purposes of this motion; the conclusions Plaintiff draws from them are indefensible.  *Cf. Campbell* v. *Aduddell*, No. 11 Civ. 1413 (NAM) (ATB), 2014 WL 4659364, at *9 (N.D.N.Y. Sept. 17, 2014) ("[T]here is nothing in the proposed amended complaint to link any of the defendants with the incidents related by plaintiff in support of this claim.  No matter how liberally construed, these irrational, incredible allegations do not plead a plausible claim under this act, nor is there any basis to believe that there are additional facts which could plausibly support such a claim if plaintiff were given another opportunity to amend.  These allegations do not state a federal claim.").

Plaintiff is not aided by his opposition papers.  At several points, Plaintiff suggests that the Court consider materials outside of the record.  (*See, e.g.*, Pl. Opp. 4 (noting that a computer technician's assessment that Plaintiff's computer had been hacked was "not include[d] in the Amended Verified Complaint for reasons of brevity," and that Plaintiff continues to lose documents from his email account inbox)).  Even were it appropriate for the

Court to consider these materials, *cf. Torrico* v. *Int'l Bus. Machs. Corp.*, 213 F.

Supp. 2d 390, 399 n.4 (S.D.N.Y. 2002) (Lynch, J.) (noting that a court may

consider factual allegations contained in a *pro se* litigant's opposition papers

and other court filings), they would not remediate the pleading deficiencies

outlined in this Opinion.[10]

Plaintiff also allocates significant space in his opposition brief to

irrelevant arguments.  For example, one section of the brief, captioned "What's

a Throw Down Gun?" (Pl. Opp. 12-14), begins with Plaintiff's recollections of

---

[10]     One accusation raised in the portion of Plaintiff's opposition brief dedicated to the
alleged "deletion or falsification of emails" (Pl. Opp. 6) requires a brief response — if only
to illustrate Plaintiff's knack for inferring sinister designs from the most benign
occurrences.  Plaintiff directed the Court's attention to an email he sent to his cousin,
Renee Colwell, in July 2007, which Colwell forwarded to Laura McNaughton roughly
one hour later.  (*Id.* at 5; *see also id.* at 35 (email attachment)).  The substance of the
email is largely irrelevant; Plaintiff instead takes issue with the email header, which
reads, "From: renee.colwell@gmail.com on behalf of Renee Colwell [colwell@nyc.com]."
(*Id.* at 35).  Presumably as an example of how Laura McNaughton and others may be
conspiring to falsify email records, Plaintiff levels a claim that this email chain is not
what it purports to be:

> Plaintiff has used emails for many years and has never seen a
> forward like this.  It's almost as if on July 10, 2007, the poor
> overworked City email application had requested help from the
> private sector to complete its tasks.  Why wasn't this email simply
> forwarded to plaintiff's sister, 68 minutes after it was received, from
> colwell@nyc.com?   Perhaps because it wasn't forwarded until
> maybe June of 2014, at a time when plaintiff's cousin no longer
> had her city email account, to provide an explanation as to why
> plaintiff's sister even knew of it, much less had it in her possession?

(Pl. Opp. 5-6).  Plaintiff's conjecture notwithstanding, there is a wholly plausible
explanation of the appearance of this particular document, albeit one that is rather
more mundane than Plaintiff supposes:  Google's email service provider, Gmail, allows
users to send emails from personal or work email addresses through its web-based
interface.  *See* Send Mail from a Different Address or Alias, Gmail,
https://support.google.com/mail/answer/22370?hl=en (last visited Feb. 3, 2015)
("Gmail lets you send messages with another of your email addresses listed as the
sender instead of your Gmail address.  This feature helps you manage multiple
accounts from the Gmail interface[.]").  The Court may, and does, take judicial notice of
this fact.  *Magnoni* v. *Smith & Laquericia, LLP*, 701 F. Supp. 2d 497, 501 (S.D.N.Y.
2010) (noting that a court generally has discretion to take judicial notice of internet
materials), *aff'd*, 483 F. App'x 613 (2d Cir. 2012) (summary order).

his own stint as an Assistant Corporation Counsel, and then proceeds to a discussion of a few examples of police misconduct reported by the media, from which Plaintiff seeks to impart plausibility to his own allegations by noting "the propensity of police personnel to violate relatively clear rules governing proper police behavior" (*id.* at 14). Plaintiff also suggests that the Amended Complaint is saved by a statistical analysis that is nowhere set forth in the document; according to Plaintiff, having previously observed police officers at Tompkins Square Park in one of every ten of his visits, Plaintiff began seeing them on every visit, which increase could only be attributed to the stalking campaign outlined in his Amended Complaint. (*Id.* at 14-15).

In short, Plaintiff's opposition brief confirms the absence of factual support that could "nudge [his] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Throughout the brief, Plaintiff suggests that his complaint must succeed unless and until Defendants provide a competing explanation for all of the "anomalous occurrences" cited therein. (Pl. Opp. 2 ("As yet, the city defendants have offered no explanation whatsoever as to why all of the 'anomalous' occurrences alleged by plaintiff have actually occurred. Perhaps the city defendants will do so in their reply papers."); *id.* at 15 ("Unless the city defendants[] are arguing that plaintiff is hallucinating police cars, or can come up with a viable reason why there is this sudden increase in police cars during the daytime in these very safe neighborhoods, they cannot explain the results of this statistical analysis. A similar analysis can be made regarding plaintiff's claims concerning stalking by civilian

vilgilantes."); *id.* at 18 ("Unless and until the city defendants are able to put

forth a plausible alternative explanation as to why all the incidents plaintiff

alleges in the Amended Verified Complaint have happened, given that the Court

is required to accept plaintiff's allegations as true for the purposes of a motion

to dismiss, *it is respectfully submitted that the only possible inference to be*

*drawn is that the NYPD was involved in all of these occurrences.*" (internal

citation omitted and emphasis added)).  To similar effect, Plaintiff offers the

following list of rhetorical questions:

> Who is deleting plaintiff's emails between his sister and himself, and to various forensic computer specialists, if not the NYPD?  Who is deleting relevant information from a computer disk located in plaintiff's bureau, if not the NYPD?  Who is interfering with plaintiff's attempts to obtain the services of private detectives and to serve the defendants herein, if not the NYPD?  Why were police officers stationed in a public library during three weekly visits that plaintiff made to that library?

(Pl. Opp. 17).

According to Plaintiff, his allegations "permit — if not demand that — an

inference be made concerning NYPD involvement."  (Pl. Opp. 17).  The Court

disagrees.  What Plaintiff is actually proposing is a perverse form of *res ipsa*

*loquitur*, in which he is permitted to bring a federal claim for constitutional

violations against the NYPD, based solely on the occurrence of several events

(such as the misplacing of items or the loss of computer files) that are simply

part of the human experience, and for which a Grand Unified Theory is neither

possible nor necessary.  Under no definition of the term can Plaintiff's

allegations, taken in their totality, be said to be "plausible."

### b.  Plaintiff Fails to State a Claim Under Section 1983

#### i.  Potential First Amendment Claims

Construing his factual allegations as broadly as the law permits, the Court also finds that Plaintiff has failed to allege a violation of his constitutional rights.  Beginning with his First Amendment claims, Plaintiff claims that the NYPD engaged in concerted efforts to chill his speech.  (*See* Am. Compl. ¶ 39 ("The actions of the defendants named herein were designed and did deprive plaintiff of his rights under the Constitution of the United States ... to express his thoughts without retaliation[.]")).  In order for a private citizen to state a claim for First Amendment retaliation against a public official, he must allege that: (i) he engaged in speech protected by the First Amendment; (ii) defendants' actions were motivated or substantially caused by his exercise of that right; and (iii) there was a resultant and "actual chill[ing]" of his exercise of that constitutional right.  *Curley* v. *Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).  With particular respect to the third element, "[i]n the First Amendment context, allegations of a 'subjective chill' of free speech rights will not suffice to satisfy the injury-in-fact requirement."  *Brooklyn Legal Servs. Corp.* v. *Legal Servs. Corp.*, 462 F.3d 219, 226 (2d Cir. 2006) (citing *Laird* v. *Tatum*, 408 U.S. 1, 13-14 (1972)), *overruled on other grounds*, *Bond* v. *United States*, 131 S. Ct. 2355 (2011).  "Rather, a plaintiff must demonstrate some specific present or future objective harm that the challenged ... [conduct] has

inflicted by deterring him from engaging in protected activity." *Id.* (citing *Latino Officers Ass'n* v. *Safir*, 170 F.3d 167, 170 (2d Cir. 1999)).[11]

Plaintiff here can show neither actual chilling of his speech nor a non-speech-related harm analogous to those recognized by the Second Circuit. Plaintiff's speech has not been chilled, as the filing of the instant lawsuit attests. *See Curley*, 268 F.3d at 73 ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."). Moreover, as Defendants note (Def. Reply 5-6), Plaintiff cannot plausibly claim retaliation for filing his complaint with the CCRB, since the purportedly retaliatory conduct — which includes stalking as well as monitoring and modifying the contents of Plaintiff's computer — is alleged to have begun well before his complaint was filed (*see* Am. Compl. ¶¶ 14-19).

For the first time in his opposition, Plaintiff offers several additional grounds for a First Amendment violation, none of which succeeds. First, Plaintiff discerns a First Amendment violation in the lack of response he received from his complaint to the CCRB. (Pl. Opp. 10; *see* Am. Compl. ¶ 19). Again, Defendants are correct in noting (Def. Reply 3) that Plaintiff does not allege in the Amended Complaint that any inaction on the part of the CCRB (an

---

[11]   The Second Circuit subsequently clarified that "[c]hilled speech is not the *sine qua non* of a First Amendment claim." *Dorsett* v. *County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013). Rather, a plaintiff has standing to bring such a claim if he can show either that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm. The Circuit has recognized various non-speech-related harms to be sufficient to give a plaintiff standing. *See, e.g.*, *Zherka* v. *Amicone*, 634 F.3d 642, 646 (2d Cir. 2011) (lost government contract); *Tabbaa* v. *Chertoff*, 509 F.3d 89, 102 (2d Cir. 2007) (additional scrutiny at border crossing); *Dougherty* v. *Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002) (revoking a building permit); *Gagliardi* v. *Village of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (refusal to enforce zoning laws).

agency that, of necessity, exists independent of the NYPD) was caused by police intervention.  There is no suggestion in his opposition papers that Plaintiff can plausibly allege such a causal link.  More broadly, the failure of law enforcement to investigate a claim does not, standing alone, amount to a constitutional violation.  *See Gomez* v. *Whitney*, 757 F.2d 1005, 1006 (9th Cir. 1985) (per curiam) (claim against a police department for failure to investigate is insufficient to state a civil rights claim without another recognized constitutional right being involved); *McCaffrey* v. *City of New York*, No. 11 Civ. 1636 (RJS), 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) (same); *Bernstein* v. *New York*, 591 F. Supp. 2d 448, 460 & nn.105-06 (S.D.N.Y. 2008) (same).

Plaintiff also suggests that the stalking behavior he alleges in the Amended Complaint is sufficient to establish a First Amendment violation.  (Pl. Opp. 11).  This argument also fails.  Plaintiff is correct that some courts have recognized a claim of First Amendment retaliation for harassment in the form of stalking by state actors (such as police officers) in response to a plaintiff's exercise of protected speech (such as the filing of a lawsuit).  (*See id.*). However, those cases involved far more detailed allegations than are contained in the Amended Complaint linking the police activity to the protected speech. *See, e.g.*, *Marczeski* v. *Brown*, No. 02 Civ. 894 (GLG), 2002 WL 31682175, at *5 (D. Conn. Nov. 21, 2002) (upholding stalking claim where officers are alleged to have harassed plaintiff "by following her down the street, by trespassing on private property to get information off of her truck, and by repeatedly parking behind her truck"); *cf. Longinott* v. *Bouffard*, No. 11 Civ. 4245 (VB), 2012 WL

24

1392579, at *4 (S.D.N.Y. Apr. 17, 2012) (dismissing First Amendment

retaliation claim based on stalking: "Here, the complaint contains no similarly

specific allegations of harassment and stalking.  The complaint does not allege,

for example, that plaintiff was charged, ticketed, fined, or stopped by [the police

officer].  Simply because plaintiff says she was stalked and harassed does not

make it so.  Therefore, plaintiff has not alleged her speech was actually chilled

or she suffered independent injury as a result of [the officer]'s actions.").  In

addition, Plaintiff cannot allege retaliatory stalking here because, according to

the Amended Complaint, the stalking behavior of which he complains

predated — and, indeed, was the genesis of — the CCRB complaint that is

Plaintiff's proffered exercise of protected speech.  (*See* Am. Compl. ¶¶ 15, 18-

19).

Finally, Plaintiff argues a violation of his First Amendment right of access

to the courts, namely, that "in destroying much of the evidence that had

accumulated, the police have severely hampered plaintiff's ability to

successfully bring a civil action, to file a criminal complaint, to attract media

attention, and to obtain legal counsel." (Pl. Opp. 10).  *See Christopher* v.

*Harbury*, 536 U.S. 403, 413-14 & n.11 (2002) (describing such claims as

"backward-looking access claims"); *see also Oliva* v. *Town of Greece, NY*, No. 13

Civ. 6377 (FPG), — F. Supp. 3d —, 2014 WL 6769759, at *4 (N.D.N.Y. Dec. 1,

2014) ("A backward-looking access claim does not break down barriers to

judicial relief.  Rather, judgment in the access claim itself serves as a

substitute for relief from the underlying claim, which no longer can be

litigated.").[12]  The Second Circuit has emphasized, however, that "[t]he viability of [such] claims is far from clear," pointing out that the *Harbury* decision was careful not to endorse their validity.  *Sousa* v. *Marquez*, 702 F.3d 124, 128 (2d Cir. 2012).

Nevertheless, even assuming backward-looking access claims are actionable, Plaintiff's claim would fail.  "[S]uch claims are available only if a judicial remedy was 'completely foreclosed'" by the alleged cover-up.  *Sousa*, 702 F.3d at 128 (quoting *Broudy* v. *Mather*, 460 F.3d 106, 120 (D.C. Cir. 2006)).  Plaintiff has not alleged in his Amended Complaint, nor has he argued in his opposition brief, that the loss or destruction by the NYPD of any evidence has completely foreclosed his ability to bring his other constitutional claims, and the filing of the instant suit would belie any such argument.  And to the extent that Plaintiff claims that the absence of this evidence makes it more difficult for him to prove his claims, his access to court claim still fails, because "a plaintiff who has knowledge of the facts giving rise to his claim and an opportunity to rebut opposing evidence *does* have adequate access to a judicial remedy."  *Sousa*, 702 F.3d at 128-29 (emphasis in original); *see also id.* at 128 ("Common to [decisions in which other circuits have recognized a backward-looking right of access] is the sensible recognition that when a plaintiff in a backward-looking access suit alleges that the government concealed or

---

[12]     The Supreme Court previously found that a denial of access claim requires plausible allegations that a defendant "hindered [plaintiff's] efforts" to pursue a *non-frivolous* legal claim.  *See Lewis* v. *Casey*, 518 U.S. 343, 352 (1996).  Furthermore, in *Christopher*, the Court made clear that the putative plaintiff was required to allege the underlying cause of action that was lost because of the denial of access.  536 U.S. at 417-18.

manipulated relevant facts, the claim may not proceed if the plaintiff was, at the time of the earlier lawsuit, aware of the facts giving rise to his claim." (collecting cases)).

### ii.     Potential Fourth Amendment Claims

Plaintiff also alleges a Fourth Amendment violation in the Amended Complaint.  (*See* Am. Compl. ¶ 39 ("The actions of the defendants named herein were designed and did deprive plaintiff of his rights under the Constitution of the United States to be free from unreasonable search and seizure[.]")).  However, the factual underpinnings of this claim — that the NYPD, over a protracted period of time, monitored Plaintiff's telephone and computer, and repeatedly broke into his apartment, each time without leaving a hint of their intrusion — are plainly implausible.  The Court will not allow this claim to go forward solely on the basis of Plaintiff's ruminations.

Plaintiff again raises new claim in his opposition papers, namely, that his "encounter" with NYPD officers at a Dunkin Donuts, after which he learned of a tear in his pants, amounts to battery sufficient to support an excessive force claim under the Fourth Amendment.  (Pl. Opp. 18; *see* Am. Compl. ¶ 18 ("Four NYPD officers followed plaintiff into the establishment.  Upon information and belief, one of these officers took a knife or other sharp object and cut plaintiff's pants around the crotch area.")).  As an initial matter, Plaintiff's allegations do not clear the plausibility hurdle, particularly when considered in light of the more equivocal language in his CCRB complaint.  (*See* Dkt. 33-2 at 4 (noticing days after the incident that there was a tear in the pants, and assuming, based

solely on the proximity of the officers, that one of them "took a knife to my pants while I was waiting for my order")).  In any event, the tearing of Plaintiff's pants, even if intentional, does not amount to excessive force resulting in an unreasonable seizure under the Fourth Amendment.  *See generally Graham* v. *Connor*, 490 U.S. 386, 396-99 (1989) (outlining standards for excessive force analysis).  Indeed, even crediting Plaintiff's allegations, the encounter with NYPD officers at Dunkin Donuts would not appear to constitute a seizure for Fourth Amendment purposes.  *Cf. Florida* v. *Bostick*, 501 U.S. 429, 434 (1991) (noting that casual police-citizen contact does not implicate the Fourth Amendment's prohibition against unlawful seizures: "The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature.").

### iii.    Potential Fourteenth Amendment Claims

Finally, Plaintiff claims that Defendants' actions violated "his rights to privacy and to due process."  (Am. Compl. ¶ 39).  In the Amended Complaint, Plaintiff cites as support for his right to privacy claims the unauthorized entries into his apartment by the NYPD, with the aid of Defendant Laura McNaughton.  (*See id.* at ¶ 32 ("Upon information and belief, there have been other unauthorized incursions into plaintiff's apartment and other significant violations of plaintiff's right to privacy, all involving the NYPD."); *id.* at ¶ 36 ("Upon information and belief, plaintiff's sister aided the police in these violations of plaintiff's privacy and civil rights and personally engaged in an unauthorized search of plaintiff's documents and belongings.")).  Plaintiff does not articulate his due process claims in the Amended Complaint, but argues in

his opposition brief that "[t]his claim is independent of plaintiff's retaliation claim, and involves the fact that for years the NYPD has been defaming plaintiff, which defamation then resulted in plaintiff being stalked almost every time he left his apartment by civilian vigilantes." (Pl. Opp. 16).[13]

Plaintiff's right to privacy claims are substantively indistinct from Plaintiff's Fourth Amendment claims of unlawful searches and seizures, and fail for the same reasons — his allegations of multiple incursions by the NYPD and his sister into his home and his computer are just not plausible. His due process claims fail as well, because he has alleged neither a recognized liberty or property interest nor its improper deprivation. For the many reasons set forth above, the Court does not credit Plaintiff's allegations of "baiting" and "stalking" campaigns by the NYPD; accordingly, Plaintiff has not alleged outrageous government conduct sufficient to state a due process violation. *Cf. United States* v. *Cromitie*, 727 F.3d 194, 217-18 (2d Cir. 2013) (recognizing, in the criminal context, that outrageous government conduct can be basis for dismissal of conviction).

Plaintiff's effort to analogize his case to the due process claims brought by individuals required to register as sex offenders fares no better. (Pl. Opp. 16-17). The Second Circuit has observed:

> Generally, defamation is an issue of state, not of federal constitutional, law. However, under limited circumstances, federal constitutional relief is available

---

[13]    This term is understood to cover the underage girls (and their parents) who were "paraded" before Plaintiff in an effort to entice him, Plaintiff's neighbors, and certain staff at the New York Public Library branch that Plaintiff frequented. (*See* Pl. Opp. 16, 17, 19 (citing Am. Compl. ¶¶ 14, 25, 37)).

> for defamation committed by government officials.
> Specifically, an action can be grounded in 42 U.S.C.
> § 1983 when that plaintiff can demonstrate a
> stigmatizing statement plus a deprivation of a tangible
> interest.
>
> To establish a "stigma plus" claim, a plaintiff must show
> [i] the utterance of a statement sufficiently derogatory
> to injure his or her reputation, that is capable of being
> proved false, and that he or she claims is false, and [ii] a
> material state-imposed burden or state-imposed
> alteration of the plaintiff's status or rights. This state-
> imposed alteration of status or burden must be in
> addition to the stigmatizing statement. Thus, even
> where a plaintiff's allegations would be sufficient to
> demonstrate a government-imposed stigma, such
> defamation is not, absent more, a deprivation of a
> liberty or property interest protected by due process.

*Vega* v. *Lantz*, 596 F.3d 77, 81 (2d Cir. 2010) (internal citations and quotation

marks omitted)); *see generally Paul* v. *Davis*, 424 U.S. 693, 699-701 (1976).

Even if Plaintiff had adequately alleged a stigmatizing statement uttered by a

state actor — and he has not — he has utterly failed to allege a state-imposed

alteration of status or burden.  He has therefore failed to allege an actionable

due process violation.

    To recapitulate: Construing the Amended Complaint as broadly as

Plaintiff's factual allegations will permit, and even considering the arguments

and evidence presented in Plaintiff's opposition papers, the Court cannot

identify a viable cause of action under Section 1983 against any of the

Municipal Defendants.  Accordingly, the Amended Complaint is dismissed as to

them.

### 3.    The Complaint Is Dismissed as to Laura McNaughton

Laura McNaughton moves, *pro se*, to dismiss the Amended Complaint on the bases of failure to state a claim and lack of personal jurisdiction.  (*See* LM Br. 1; LM Reply 1, 4).  The above analysis makes clear that Plaintiff has failed to plead a plausible claim under Section 1983 as against the Municipal Defendants, and it can be argued that Plaintiff's Section 1983 claim against his sister is even weaker.  Plaintiff's factual allegations concerning Laura McNaughton are largely conclusory; while Plaintiff asserts early in the Amended Complaint that his sister falsely advised others that he was a pedophile, that is effectively the totality of the conduct alleged.  Indeed, Laura McNaughton appears to be an afterthought in the Amended Complaint: "Upon information and belief, plaintiff's sister aided the police in these violations of plaintiff's privacy and civil rights and personally engaged in an unauthorized search of plaintiff's documents and belongings."  (Am. Compl. ¶ 36).

Plaintiff has likewise failed to allege "state action" for which Laura McNaughton would be liable.  The Supreme Court has recognized that private individuals may be liable for joint activities with state actors even where those private individuals had no official power under state law, as where, for example, they have conspired with or engaged in joint activity with state actors. *See, e.g.*, *Filarsky* v. *Delia*, 566 U.S. —, —, 132 S. Ct. 1657, 1661-62 (2012) ("Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." (collecting cases)); *Dennis* v. *Sparks*, 449 U.S. 24, 27-28 (1980) ("[T]o act 'under color of' state law for § 1983 purposes does not

require that the defendant be an officer of the State.  It is enough that he is a

willful participant in joint action with the State or its agents.  Private persons,

jointly engaged with state officials in the challenged action, are acting 'under

color' of law for purposes of § 1983 actions.").  The Second Circuit has

cautioned, however, that

> [t]o state a claim for a § 1983 conspiracy, a plaintiff
> must allege "[i] an agreement between a state actor and
> a private party; [ii] to act in concert to inflict an
> unconstitutional injury; and [iii] an overt act done in
> furtherance of that goal causing damages." *Ciambriello*
> v. *County of Nassau*, 292 F.3d 307, 324-25 (2d Cir.
> 2002). "[C]omplaints containing only conclusory, vague,
> or general allegations that the defendants have engaged
> in a conspiracy to deprive the plaintiff of his
> constitutional rights are properly dismissed; diffuse and
> expansive allegations are insufficient, unless amplified
> by specific instances of misconduct."  *Id.* at 325
> (internal quotation marks omitted).  "[T]he pleading of a
> conspiracy will enable a plaintiff to bring suit against
> purely private individuals, [but] the lawsuit will stand
> only insofar as the plaintiff can prove the sine qua non
> of a § 1983 action: the violation of a federal right." *Singer*
> v. *Fulton County Sheriff*, 63 F.3d 110, 119 (2d Cir.
> 1995).

*McGee* v. *Doe*, 568 F. App'x 32, 35 (2d Cir. 2014) (summary order); *see also*

*Spear* v. *Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (conclusory

allegation that a private entity acted in concert with a state actor does not

suffice to state a Section 1983 claim against the private entity).

Plaintiff seeks to allege a Section 1983 conspiracy in the Amended

Complaint; he references on several occasions 42 U.S.C. § 1985, the conspiracy

provision of the statute.  (Am. Compl. ¶¶ 1, 2).  Reviewing the Amended

Complaint in its totality, however, the Court must conclude that Plaintiff's

allegations concerning the involvement of Laura McNaughton are entirely too "diffuse and expansive" — as well as implausible, for the reasons set forth *supra* — to state a federal claim against her.  *See generally Webb* v. *Goord*, 340 F.3d 105, 111 (2d Cir. 2003) (upholding dismissal of conspiracy claim where the plaintiffs did not allege, "except in the most conclusory fashion, that any such meeting of the minds occurred among any or all of the defendants"). Thus, the Court dismisses the federal claim as to Laura McNaughton as well.

### 4.   The Court Declines to Exercise Jurisdiction Over Plaintiff's State Law Claims

In addition to his federal Section 1983 claim, Plaintiff alleges as well a pendent claim under New York State law for defamation.  (Am. Compl. ¶¶ 42-45).  Having dismissed Plaintiff's federal claim as to the Municipal Defendants and Laura McNaughton, the Court declines to exercise jurisdiction over the defamation claim.

Where all federal claims are dismissed, a district court has discretion to retain supplemental jurisdiction over any pendent state law claims.  *See* 28 U.S.C. § 1367(c)(3).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctr. Ret. Plan* v. *Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 727 (2d Cir. 2013) (internal quotation marks and citations omitted); *see also N.Y.S. Prof. Process Servers Ass'n, Inc.* v. *City of New York*, No. 14 Civ. 1266 (DLC), 2014 WL

4160127, at *12-13 (S.D.N.Y. Aug. 18, 2014) (declining to exercise jurisdiction over pendent claim of defamation).

### 5.    Plaintiff Will Not Be Given Leave to Amend His Complaint

Plaintiff suggests in his opposition that he is entitled to leave to replead his claims.  (Pl. Opp. 8).  His suggestion, however, overlooks the facts that he is an attorney and that he previously amended his Complaint upon learning from counsel for the Municipal Defendants of their intention to move to dismiss for failure to state a claim.  *See De Jesus* v. *Sears, Roebuck & Co.*, 87 F.3d 65, 72 (2d Cir. 1996) (noting that the Second Circuit has "upheld decisions to dismiss a complaint without leave to replead when a party has been given ample prior opportunity to allege a claim").  More importantly, the Court has considered the supplemental arguments and evidence that Plaintiff presented in his opposition papers; it has discussed them throughout this Opinion; and it is confident that any attempt by Plaintiff to replead would be futile.  *See, e.g., Lucente* v. *Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).

### CONCLUSION

The motions to dismiss by the Municipal Defendants and Laura McNaughton are GRANTED; the Section 1983 claim is DISMISSED WITH PREJUDICE, and the defamation claim is DISMISSED WITHOUT PREJUDICE, as to each of them.  The Amended Complaint is DISMISSED WITHOUT PREJUDICE as to Defendant Detective Jackson because of Plaintiff's failure to comply with Fed. R. Civ. P. 4(m).

34

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:       February 4, 2015
             New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

| A copy of this Order was mailed by Chambers to: | A copy of this Order was mailed by Chambers to: |
|---|---|
| Neil McNaughton<br>10 W. 15th Street, Ste. 418<br>New York, NY 10011 | Laura McNaughton<br>351 Brudle Path<br>Worcester, MA 01604-1306 |